***ATTORNEY-CLIENT PRIVILEGE***

1

```
 1            IN THE CIRCUIT COURT OF THE FIRST CIRCUIT
 2                         STATE OF HAWAII
 3       -------------------------------------------
 4       SPORTS SHINKO (USA) CO., LTD., a Delaware
 5       Corporation; SPORTS SHINKO (MILILANI)
 6       CO., LTD., a Hawaii corporation, et al.,
 7              Plaintiff,
 8         vs.              Case No. 02-1-2766-11 (EEH)
 9       RESORT MANAGEMENT SERVICES
10       (HAWAII), INC., a Hawaii corporation,
11       YASUO NISHIDA, SATOSHI KINOSHITA, et al.
12              Defendants.
13       -------------------------------------------
14
15              DEPOSITION OF SATOSHI KINOSHITA
16                         (Volume I)
17
18       Taken on behalf of the Plaintiff at Alston Hunt Floyd &
19       Ing, 1001 Bishop St., ASB Tower, 18th Floor, Honolulu,
20       Hawaii 96813, commencing at 9:08 a.m., Tuesday, April
21       19, 2005, pursuant to Notice.
22
23       BEFORE:   BARBARA ACOBA, CSR No. 412, RPR
24                 Notary Public, State of Hawaii
25                      EXHIBIT Q
```

RALPH ROSENBERG COURT REPORTERS
Honolulu, Hawaii  (808) 524-2090

```
 1   APPEARANCES:
 2   For Plaintiff:          GLENN MELCHINGER, Esq.
 3                           ALSTON HUNT FLOYD & ING
 4                           ASB Tower
 5                           1001 Bishop St., 18th Floor
 6                           Honolulu, Hawaii 96813
 7
 8   For Defendant SATOSHI KINOSHITA:
 9                           JOHN KOMEIJI, Esq.
10                           WATANABE ING KAWASHIMA & KOMEIJI
11                           First Hawaiian Center
12                           999 Bishop St., 23rd Floor
13                           Honolulu, Hawaii 96813
14
15
16   Also Present:           STEVEN SILVER - Interpreter
17
18
19
20
21
22
23
24
25
```

***ATTORNEY-CLIENT PRIVILEGE***

```
 1  with an outfit called Insigna that -- no, actually, it
 2  was Hotel Partners. Ron Watanabe, if I'm not mistaken.
 3       Q.   And that was around 1996?
 4       A.   Yes.
 5       Q.   You testified you were instructed to sell
 6  Diamond Head Beach Hotel; is that right?
 7       A.   Yes.
 8       Q.   By who?
 9       A.   The president of the company.
10       Q.   Did he give any reason why you should sell
11  Diamond Head Beach Hotel?
12       A.   I don't really recall. However, in Japan it's
13  not considered very polite to object to or question the
14  instructions you receive from the president of a
15  company. And in the case of our company, the president
16  was essentially like a sole shareholder. He wielded
17  complete authority, so it was even more the case in our
18  particular company.
19            And in addition to that, when I joined the
20  company in 1991, I was told by the president of the
21  company that given the fact that I was his child, that
22  if I didn't listen to him, then none of the other
23  employees and officers of the company would want to
24  listen to him. So, no, I didn't question the president
25  about the reasons behind what he was instructing me to
```

1  do.
2      Q.   When you were acting as a director of the
3  Sports Shinko Japan company and were still living in
4  Japan, as part of your work for the, what do you call
5  it, financial analysis department, did you review
6  financial statements for the golf courses that were in
7  your -- within your block, within the block for which
8  you were the area manager?
9      A.   No.
10     Q.   What kind of financial information did you
11 review?  Was it the same type of information you
12 reviewed for the Hawaii subsidiaries?
13     A.   While I don't recall clearly, I believe that
14 the information I reviewed was more general than the
15 information that I was reviewing with respect to the
16 Hawaii subsidiaries.  Well, in particular, as it applied
17 to the situation in Japan, as an area manager all that
18 individuals in that position would do would be to
19 examine up to the point of operating profit.  That is to
20 take a look at the sales generated by operations and to
21 deduct from that the various costs incurred in
22 operations.  And so we would essentially review
23 operating results, if you will, up to the point of
24 operating profit and we didn't have knowledge, for
25 instance, with respect to debts.  We would just take a

```
 1        Q.   That's what I'm asking you, what types of
 2   direction did he give you, the president give you, about
 3   anything about the Hawaii properties?  Let me ask it
 4   this way:  What's the scope of your authority versus the
 5   president's authority?
 6        A.   I had virtually zero in the way of authority.
 7   I would consult with the general managers of the various
 8   golf course and hotel properties and then look to the
 9   president to make decisions.
10        Q.   So back to my original question, so the scope
11   of the president's decision making authority was almost
12   plenary; is that right?
13        A.   Yes.  He had -- yes, virtually plenary
14   authority.
15        Q.   He would leave or would he leave day-to-day
16   management decisions to Jerry Kimoto or the managers of
17   the individual properties, for example?
18        A.   He would leave minor decision making to them,
19   yes.
20        Q.   But for bigger strategic or bigger business
21   decisions, he would give the direction first to you and
22   then it would -- break this down, the president would
23   make the bigger business decisions regarding the Hawaii
24   assets, yes?
25        A.   Yes.
```

> Note: Deposition Exhibit 29, which is also referred to below as "P & S agreement", is attached as Exhibit S to CSOF (excerpts)

1     (Exhibit 29 marked for identification.)
2  BY MR. MELCHINGER:
3     Q.  Showing you what's been marked as Exhibit 29 to
4  your deposition, and wonder if you recognize this
5  document?
6     A.  I do.
7     Q.  Okay.  And what is this document, please?
8     A.  This is the purchase and sale agreement between
9  Sports Shinko and the KG Group for the hotel and the
10 golf courses.
11    MR. KOMEIJI:  Again, we rely upon you that this
12 is a complete set.  Again, no inferences are being
13 drawn, I just put that for the record.
14    MR. MELCHINGER:  I understand.  And I'll
15 represent for the record that this is taken from the
16 McCorriston's files, again, that were produced to us in
17 response to a Rule 2004 exam in the Section 304
18 proceeding in the Bankruptcy Court.
19 BY MR. MELCHINGER:
20    Q.  On pages 27 and 28, is that your signature that
21 appears on those pages?
22    A.  Yes.
23    Q.  And you're signing on behalf of all the Sports
24 Shinko companies that are party to this agreement; is
25 that right?

1    A.   Yes.  I was instructed to sign by the
2    president.
3    Q.   Now, this was on the 15th and the closing was
4    scheduled, I think you said, for the 28th in the
5    agreement.  Between -- well, during that 13-day period
6    or so, what do you recall about the negotiations with
7    KG, if anything, to assume the management agreements
8    with RMS?
9    A.   Well, RMS was a separate and independent
10   third-party entity, if you will, and so all that I did
11   was that I recommended that if it was okay with the
12   other side, that we'd like to see them continue to use
13   RMS as RMS had been managing Sports Shinko's hotels and
14   golf courses.
15   Q.   How involved were you with the negotiations
16   with KG on that issue, the assumption of the RMS
17   management agreements?
18   A.   To the best of my recollection, that did not
19   take place during the roughly 13 days between the date
20   of the signing of the contract and the date of the
21   closing, but took place prior to that.
22        (Exhibit 30 marked for identification.)
23   BY MR. MELCHINGER:
24   Q.   Show you what's been marked Exhibit 30 to your
25   deposition.  Tell me if you've seen that before, please.

```
 1   with the president; is that right?
 2        A.   Yes.
 3        Q.   It says he was at an undisclosed hotel.  Was
 4   that a hotel in Japan or in Hawaii?
 5        A.   Japan.
 6        Q.   And it says he asked you to send the P and S
 7   agreement.  That was the purchase and sale agreement
 8   with KG; is that right?
 9        A.   Yes.
10        Q.   Did you translate the agreement for him?
11        A.   Yes.
12        Q.   And this is before it was signed; is that
13   right?
14        A.   Yes.
15        Q.   So you sent him, was it a full Japanese
16   translation or an abbreviated Japanese translation?
17   What did you send to him?
18        A.   I sent him both a summary and a full
19   translation.
20        Q.   And at this time he said he was -- did he say
21   he was negotiating with the RCC?
22        A.   Yes.
23        Q.   And he needed something from you to show to the
24   RCC; is that right?
25        A.   Yes.
```