IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAII

---

SPORTS SHINKO (USA) CO., LTD., a Delaware Corporation; SPORTS SHINKO (MILILANI) CO., LTD., a Hawaii corporation, et al.,

Plaintiff,

vs. Case No. 02-1-2766-11 (EEH)

RESORT MANAGEMENT SERVICES (HAWAII), INC., a Hawaii corporation, YASUO NISHIDA, SATOSHI KINOSHITA, et al.

Defendants.

---

DEPOSITION OF SATOSHI KINOSHITA

(Volume II)

Taken on behalf of the Plaintiff at Alston Hunt Floyd & Ing, 1001 Bishop St., ASB Tower, 18th Floor, Honolulu, Hawaii 96813, commencing at 9:04 a.m., Wednesday, April 20, 2005, pursuant to Notice.

BEFORE: BARBARA ACOBA, CSR No. 412, RPR

Notary Public, State of Hawaii

EXHIBIT 4

APPEARANCES:

For Plaintiff: GLENN MELCHINGER, Esq.
ALSTON HUNT FLOYD & ING
ASB Tower
1001 Bishop St., 18th Floor
Honolulu, Hawaii 96813

For Defendant SATOSHI KINOSHITA:
JOHN KOMEIJI, Esq.
WATANABE ING KAWASHIMA & KOMEIJI
First Hawaiian Center
999 Bishop St., 23rd Floor
Honolulu, Hawaii 96813

Also Present: STEVEN SILVER - Interpreter

properties of which we had no plans to sell.

Q. For all six properties, I think for Diamond Head Beach Hotel, Queen Kapiolani, Ocean Resort and then the three golf courses, do you remember what the total for the termination fees was if, for example, you had to pay them all, or Sports Shinko had to pay them all, do you remember the grand total?

A. I believe it was either 3.5 million or 4.5 million.

Q. I think it's 3.5. I think that's right. So Mr. Fukuda when he said he was going to, if the other listed properties were sold, move those termination fees to Mililani and Queen Kapiolani, what he meant by that, as you understood it, was that that 3.5 million in termination fees would be on only those two properties or shifted into those two agreements with RMS; is that right?

A. Well, I suppose so, however, looking at the big picture, this was all hypothetical and was my understanding that no matter what anybody else said, it would ultimately be the president who would make the call.

Q. As a hypothetical, even as a hypothetical, did you think that seemed reasonable at that time to shift all the termination fees for the other contracts to just

A. I have. Yes.

Q. Okay. It appears to be a request to move the closing date to the 25th; is that what this is, sent to Mr. Hamasaki, Peter Hamasaki, from you?

A. Yes.

Q. Do you remember why you sent this to Mr. Hamasaki?

A. I do.

Q. Could you tell me why.

A. Because I was instructed to do so by the president over the telephone.

Q. Did he tell you anything about why the closing date needed to be moved to the 25th?

A. What I recall was that I was told that the management on the Japan side was in a real bind and the president wanted us to hurry up and send the sales proceeds over to Japan.

Q. Okay. Did he explain why there was a need to hurry? I'm sorry, let me clarify the question.

Did the president explain to you why there was a need to accelerate the closing date, other than that?

A. Beginning around November the year 2001, the company on the Japan side was in a real pinch. They were short on funds and in specific terms, for example, cash flow was so bad that Sports Shinko in Japan was not

even able to make the interest payments that it had agreed to make with the some 50 financial institutions, including RCC, that the Japan Sports Shinko company had borrowed money from. And so I, beginning in November, had been told constantly that we needed to hurry up and make the sale and send the proceeds of the sale to Japan. We ended up -- this ended up spilling over into the next year, into 2002, and by then the company was in a real, real bind, and I was told pretty much on a daily basis to expedite this, and I received the instructions directly by telephone -- by telephone directly.

Q. Just to clarify, that was directly from the president by telephone?

A. That's correct.

Q. Was the closing date, then, actually changed to the 25th from the 28th; do you recall?

A. I don't recall.

Q. Do you recall at some point hearing about, from the president, a meeting that he had had with any of the lenders or RCC in early January of 2001?

MR. KOMEIJI: Same objection about relevancy.

MR. MELCHINGER: I'm sorry, not 2001. 2002.

MR. KOMEIJI: Same objection as relevancy. Not reasonably calculated to lead to discovery of admissible evidence.

C E R T I F I C A T E

STATE OF HAWAII )
CITY AND COUNTY OF HONOLULU )

I, BARBARA ACOBA, Certified Shorthand Reporter and Notary Public, State of Hawaii, do hereby certify:

That on Wednesday, April 20, 2005, at 9:04 a.m., appeared before me SATOSHI KINOSHITA, the witness whose deposition is contained herein; that prior to being examined he was by me duly sworn;

That the deposition was taken down by me in machine shorthand and was thereafter reduced to typewriting under my supervision; that the foregoing represents, to the best of my ability, a true and correct transcript of the proceedings had in the foregoing matter.

I further certify that I am not an attorney for any of the parties hereto, nor in any way concerned with the cause.

Dated this 30th day of April, 2005, in Honolulu, Hawaii.

BARBARA ACOBA NOTARY PUBLIC STATE OF HAWAII

BARBARA ACOBA, CSR NO. 412
Notary Public, State of Hawaii
My Commission Exp: 10-22-2008