[Translation]

FROM : SPORTS SHINKO HAWAII CO LTD    FAX NO. : 808 931 4396    Aug. 22 2000 08:26PM   P1

[Logo]
# SPORTS SHINKO (HAWAII) CO., LTD.

August 23, 2000

To:  Toshio Kinoshita
     Representative Director/President

From:  Satoshi Kinoshita [Seal Affixed]
       Vice President

### Report re Formation of New Companies

Per your instructions, here is a description of the new companies that were formed.

| Name of Company | Description of Primary Activities |
|---|---|
| Far East Management Services, Inc. | Management, etc. of Japan facilities |
| Management Services of the Pacific, Inc. | Management, etc. of Hawaii facilities |
| Management Services of (USA), Inc. (in the process of being formed) | Management, etc. of U.S. mainland facilities |

The following is a description of the companies that have already been formed. Note that the company currently in the process of being formed is being formed per the same arrangements.

| | |
|---|---|
| Date of Establishment: | August 3, 2000 |
| Capital: | $1,000 |
| Equity Participant[s]: | Officially Satoshi Kinoshita, but nobody has made any pay-in. Once the company [bank] account is set up, Mr. Mukai will issue the go-ahead for payment to be made. |
| Number of Shares to be Issued: | 1,000 shares |
| Price per Share: | $1 |
| Total Number of Authorized Shares: | 20,000 shares |
| Owner of Shares: | Satoshi Kinoshita only |
| President: | Satoshi Kinoshita |
| Director: | Satoshi Kinoshita only |
| Officerships: | Satoshi Kinoshita only |
| Company has Articles of Incorporation? | Yes (attached hereto) |

Items Worthy of Special Mention

Regarding Shareholders/Presidents:

Shareholders and presidents shall be appointed in accordance with instructions from Representative Director/President Toshio Kinoshita. Shareholders and presidents can be easily changed by Mr. Mukai's office. However, [I] have been advised that it is preferable that any such individual[s] not have loans out from any banks in either the U.S. or Japan.

**EXHIBIT 7**

FROM : SPORTS SHINKO HAWAII CO LTD      FAX NO. : 808 931 4396        Aug. 22 2000 08:26PM  P2

Circumstances surrounding the Formation [of the Companies]:

As of the time of formation of the companies on August 3rd, Satoshi Kinoshita was the shareholder [of the companies] and Ms. Julie Kalaikai [Spelling?], Mr. Mukai's secretary, was president, director, and officer. On August 7th, Ms. Kalaikai [Spelling?] subsequently resigned as president, director, and officer and these positions were all assumed by Satoshi Kinoshita, who [now] serves as shareholder, president, director and officer. The reason why [these positions] were assumed by Satoshi Kinoshita is that he doesn't have loans out from any banks in Japan or in the U.S. If a person with loans from a bank in Japan or the U.S. [were to assume these positions], it would immediately come to the attention of Resolution and Collection Bank. Therefore, to be on the safe side, these positions were assumed by Satoshi Kinoshita.

Yesterday, however, I was served at my home, through the Secretariat of the Supreme Court and the Japanese Consulate in Honolulu, with a Decision of Provisional Attachment issued by the Osaka District Court for monies owed to Resolution and Collection Bank along with a Demand Letter. Mr. Mukai, however, believes that the provisional attachment should not pose a problem since it has to do with security monies furnished to the company. [Translator's Note: Meaning of sentence unclear]

Regarding Shareholders:

While there is[are] a stock option[s] in place to transfer the stock to Representative Director/President Toshio Kinoshita, Mr. Mukai believes that it would be safer to hold off on exercising [any such option] for several years until things with Resolution and Collection Bank and the syndicate lender group[s] settle down a bit.

Regarding the Substance of the Management Company[ies]

Proposals will be prepared regarding the make-up of the management company[ies] and the make-up [of the management company[ies] will be entirely based on things you approve in advance. This will specifically include timeframes, management fees, etc. When I showed the terms of Ron Thompson's [Spelling?] contract to Mr. Mukai, he said it was a consulting agreement - not a management agreement - and thus would not serve as a reference at all this time around since it failed to provide for performance accountability. [Mr. Mukai] indicated that he would like to discuss things again when he meets next week with Mr. Fukuda, the General Manager of the International Operations Division. Mr. Mukai thinks he won't be able to get around to La Costa or Grenelefe this time around but will only be able to [get around to] the Hawaii agreements. I, however, would like to somehow see to it that [agreements] are put in place for the U.S. mainland resorts as well.

Regarding Agreement[s] for Japan [Facilities]:

[Mr. Mukai] says that he would like you to discuss agreements for any facilities located in Japan with an attorney in Japan. He says that he would like you to explore this matter in Japan since he doesn't know anyone in Hawaii who is licensed to practice law in Japan. Perhaps you could explore the matter based on the draft[s] I sent to Mr. Fukuda.

FROM : SPORTS SHINKO HAWAII CO LTD     FAX NO. : 808 931 4396     Aug. 22 2000 08:27M   P3

To-Do Schedule (Japan time)

| Date | Task |
|---|---|
| August 25: | Prepare draft of Decision Items for the 6 Hawaii facilities, fine tune [same] with Mr. Fukuda, the International Operations General Manager, and submit to President. |
| August 26: | Revisions to Hawaii draft[s], etc. Prepare draft[s] for U.S. mainland as well. |
| August 27: | Finalize contract terms. |
| August 28: | Meet regarding contract terms following the arrival of Mr. Fukuda, the International Operations General Manager, and report to President. |
| August 29: | Discussions with Mr. Mukai |
| August 30: | Discussions with Mr. Mukai |
| August 31: | Discussions with Mr. Mukai |
| September 1: | Mr. Fukuda, the General Manager of International Operations, returns to Japan |

FROM : SPORTS SHINKO HAWAII CO LTD       FAX NO. : 808 931 4396       Aug. 22 2000 08:26PM  P1



# SPORTS SHINKO (HAWAII) CO., LTD.

平成12年8月23日

木下俊雄代表取締役社長殿



新会社設立のご報告

社長ご指示により、設立しました新会社の内容について、ご報告申し上げます。

会社名                                           主な業務内容
Far East Management Services, Inc.          国内事業所の営業委託他
Management Services of the Pacific, Inc.    ハワイ事業所の営業委託他
Management Services of (USA), Inc.   （設立中）米国本土の営業委託他

以下は設立済みの会社に関する内容ですが、設立中の会社も同様の内容で設立中でございます。

| | |
|---|---|
| 設立日 | 平成12年8月3日 |
| 資本金 | 1000ドル |
| 出資払込者 | 記録上は木下聡ですが、だれも払い込んでおりません。会社口座が設立後、払うように向井弁護士から指示があります。 |
| 発行株式数 | 1000株 |
| 一株当価格 | 1ドル |
| 株式総数 | 2万株 |
| 株式所有者 | 木下　聡のみ |
| 社長 | 木下　聡 |
| 取締役 | 木下　聡のみ |
| 役員の構成 | 木下　聡のみ |
| 定款の有無 | 有（添付要します） |

特記事項
株主また社長について
　株主、社長の選任は、木下俊雄代表取締役社長のご指示に従います。株主、社長の変更は、向井弁護士事務所にて容易に可能です。但し、日本でも、アメリカでも銀行より借り入れが無い人が良いそうです。

c/o Ocean Resort Hotel • 175 Paoakalani Avenue, Suite 300 • Honolulu, Hawaii 96815



設立の経緯
　8月3日の会社設立時には、木下聡は株主で、向井弁護士秘書のジェリー・カライカイ史が社長兼取締役兼役員でした。後8月7日に、カライカイ史は社長、取締役、また役員から辞任し、木下聡が全て引継ぎ、株主、社長、取締役、役員を兼務しております。木下聡が引き継いだ理由は、日本でも、アメリカでも銀行より借り入れが無いからです。日本もしくはアメリカで銀行より借り入れのある人は、株式会社整理回収銀行に直ぐに見つかるため、安全の為に、木下聡が為りました。
　しかし、昨日大阪地方裁判所から、最高裁判所民事局と日本国ホノルル領事館を通じ株式会社整理回収銀行の債権仮差押決定と催告状が、自宅へ送達されました。しかし、向井弁護士は、仮差押の内容が、会社に提供している保証金なので、問題は無いとの意見です。

⓶ 株主について
　株を木下俊雄代表取締役社長殿へ譲渡するストックオプションがありますが、向井弁護士の意見では、株式会社整理回収銀行や銀行団との関係が一段落するまでの数年は、実行を待った方が安全です。

運営会社の内容について
　運営会社の内容に付きましては、案を作成し、全て社長に事前にご承認を受けた事柄を内容に致します。具体的には、期間、マネジメント委託料等です。ロン・トンプソンの契約内容を向井弁護士に見せた所、これは業務委託でなく、コンサルタント契約なので、業績には責任が無い形だから、今回は全く参考にならない。来週の福田国際事業本部長との打ち合わせで再度議論したいとの事でした。向井弁護士としては、今回はハワイの契約がせいぜいでラコスタ・グレンリーフには手が廻らないと見ていますが、なんとか米国本土リゾートも締結させたいと思います。

日本国内の契約について
日本国内の事業所の契約に付きましては、国内の弁護士と相談して欲しいそうです。ハワイで日本の弁護士資格を持つ人を知らないので、国内で検討して欲しいそうです。福田国際事業本部長へ送りましたドラフトを元に、検討して戴けたらと思います。

FROM : SPORTS SHINKO HAWAII CO LTD    FAX NO. : 808 931 4396    Aug. 22 2000 08:27PM P3

今後の作業予定（日本時間）
8月25日　ハワイ6事業所の決定項目原案を作成し、福田国際事業本部長と調整し、社長へ提出致します。
8月26日　ハワイ原案の修正他、また、米国本土原案の作成
8月27日　契約書内容の詰め。
8月28日　福田国際事業本部長到着後、契約書内容について打ち合わせ、社長へご報告いたします。
8月29日　向井弁護士と協議
8月30日　向井弁護士と協議
8月31日　向井弁護士と協議
9月1日　福田国際事業本部長帰国

***ATTORNEY-CLIENT PRIVILEGE***                    1

```
 1            IN THE CIRCUIT COURT OF THE FIRST CIRCUIT
 2                          STATE OF HAWAII
 3       ---------------------------------------------
 4       SPORTS SHINKO (USA) CO., LTD., a Delaware
 5       Corporation; SPORTS SHINKO (MILILANI)
 6       CO., LTD., a Hawaii corporation, et al.,
 7             Plaintiff,
 8          vs.              Case No. 02-1-2766-11 (EEH)
 9       RESORT MANAGEMENT SERVICES
10       (HAWAII), INC., a Hawaii corporation,
11       YASUO NISHIDA, SATOSHI KINOSHITA, et al.
12             Defendants.
13       ---------------------------------------------
14
15                 DEPOSITION OF SATOSHI KINOSHITA
16                            (Volume I)
17
18       Taken on behalf of the Plaintiff at Alston Hunt Floyd &
19       Ing, 1001 Bishop St., ASB Tower, 18th Floor, Honolulu,
20       Hawaii 96813, commencing at 9:08 a.m., Tuesday, April
21       19, 2005, pursuant to Notice.
22
23       BEFORE:   BARBARA ACOBA, CSR No. 412, RPR
24                 Notary Public, State of Hawaii
25
```

***ATTORNEY-CLIENT PRIVILEGE***                    2

```
 1   APPEARANCES:
 2   For Plaintiff:         GLENN MELCHINGER, Esq.
 3                          ALSTON HUNT FLOYD & ING
 4                          ASB Tower
 5                          1001 Bishop St., 18th Floor
 6                          Honolulu, Hawaii 96813
 7
 8   For Defendant SATOSHI KINOSHITA:
 9                          JOHN KOMEIJI, Esq.
10                          WATANABE ING KAWASHIMA & KOMEIJI
11                          First Hawaiian Center
12                          999 Bishop St., 23rd Floor
13                          Honolulu, Hawaii 96813
14
15
16   Also Present:          STEVEN SILVER - Interpreter
17
18
19
20
21
22
23
24
25
```

Case 1:04-cv-00127-BMK   Document 102-10   Filed 02/21/2006   Page 9 of 13

***ATTORNEY-CLIENT PRIVILEGE***                            59

```
 1       Q.   I guess what I'm asking is:  Why couldn't the
 2  stock be sold to somebody else and somebody else assume
 3  the position of officer, director, et cetera, of those
 4  existing entities, why dissolved them?
 5       A.   That was the instruction that came down from
 6  the president.
 7            MR. MELCHINGER:  You want to take a break?
 8            MR. KOMEIJI:  Yes.
 9            (Off the record at 2:01 p.m.)
10            (Back on the record at 2:11 p.m.)
11            (Exhibit 1 marked for identification.)
12  BY MR. MELCHINGER:
13       Q.   I'm showing you what we'll label as Exhibit 1
14  to your deposition.  Have you seen that before?
15       A.   Yes, I have.
16       Q.   Can you tell me what it is, what your
17  understanding of this document is?  Its nature, not its
18  content, per se.
19       A.   This is a report to the president.
20       Q.   By you, correct?
21       A.   Yes.
22       Q.   That's your seal on the top, right side of page
23  number one?
24       A.   Yes.
25       Q.   At the bottom of this it notes that the
```

RALPH ROSENBERG COURT REPORTERS
Honolulu, Hawaii  (808) 524-2090

***ATTORNEY-CLIENT PRIVILEGE***                63

```
 1    having been made in bad faith?
 2         A.    That, I don't know.
 3         Q.    When Mr. Mukai told you about Mr. Sukamto, did
 4    he explain the context of why he mentioned Mr. Sukamto?
 5         A.    I'm sorry, I don't recall.
 6         Q.    So when you heard Sukamto, did you understand
 7    who he was talking about, who Mr. Mukai was talking
 8    about?
 9         A.    I believe I did to some extent.
10         Q.    What was your understanding?  I mean, and I'm
11    assuming if you didn't understand something you would
12    ask Mr. Mukai so that you could report to the president,
13    but can you tell me what your understanding was of why
14    he was mentioning Mr. Sukamto?
15         A.    My understanding is that Mr. Sukamto had been
16    involved with white collar crime and his case was being
17    covered all over the newspapers, and that Mr. Mukai was
18    against the idea of creating these stock options because
19    they could conceivably be mistaken for white collar
20    crime.
21         Q.    Did you understand at the time that
22    Mr. Sukamto's problems had arisen in the context of a
23    bankruptcy that he had filed, a bankruptcy case?
24         A.    No.
25         Q.    On page two, again, of Exhibit 1, and I'm
```

1  looking at the same portion with the mark that we looked
2  at before, my understanding of the sentence is that
3  Mr. Mukai was of the opinion that, if anything, should
4  wait several years before exercising it until
5  relationships between Sports Shinko and the Resolution
6  Collection Company and the banks, the lenders for Sports
7  Shinko, had improved. Is that fairly stating what
8  Mr. Mukai's opinion is?
9     A.   Yes.
10    Q.   When you wrote this sentence, what was your
11 understanding, if any, of why Mr. Mukai advised that the
12 president should wait to exercise the option?
13    A.   I don't know. And I believe that that's why I
14 simply wrote exactly what Mr. Mukai had told me here in
15 this document.
16    Q.   So you don't recall asking Mr. Mukai why should
17 he wait to exercise the option?
18    A.   I do not.
19    Q.   Do you remember why you did not write that, and
20 if it's somewhere else in the document please tell me,
21 why you did not write that Mr. Mukai was strongly
22 opposed to the option agreement?
23    A.   This, Mr. Mukai's opposition, would have been
24 something that would have come up during the time that
25 we were discussing whether or not to create these stock

1  options.  However, at the time that I wrote this report,
2  the decision had already been made to proceed with
3  creating those options, and as a result, in that
4  context, I believe I didn't report Mr. Mukai's strong
5  opposition to the idea.
6      Q.   So the president wanted to go ahead with the
7  option despite Mr. Mukai's advice; is that it?
8      A.   Yes.
9      Q.   Let's talk a little bit about the management
10 contracts.  At this point in time that you wrote Exhibit
11 1, it looks like the Mukai firm had begun to start
12 drafting or thinking about drafting the management
13 contracts; is that right?
14     A.   I'm sorry, I don't really recall.  I don't
15 recall whether they had actually started that work or if
16 they were just thinking about getting that work under
17 way.  However, what I'm referring to here is simply the
18 fact that once the management companies were
19 incorporated, that contracts would be entered into
20 between the management companies and the owner company.
21     Q.   For one of the California Sports Shinko
22 entities there was an agreement with Ron Thompson; is
23 that correct?
24     A.   Yes.
25     Q.   And Mr. Mukai had reviewed that and I presume

***ATTORNEY-CLIENT PRIVILEGE***                    95

```
 1                    C E R T I F I C A T E

 2   STATE OF HAWAII              )

 3   CITY AND COUNTY OF HONOLULU  )

 4            I, BARBARA ACOBA, Certified Shorthand

 5   Reporter and Notary Public, State of Hawaii, do

 6   hereby certify:

 7            That on Tuesday, April 19, 2005, at

 8   9:08 a.m., appeared before me SATOSHI KINOSHITA, the

 9   witness whose deposition is contained herein; that

10   prior to being examined he was by me duly sworn;

11            That the deposition was taken down by me

12   in machine shorthand and was thereafter reduced to

13   typewriting under my supervision; that the foregoing

14   represents, to the best of my ability, a true and

15   correct transcript of the proceedings had in the

16   foregoing matter.

17            I further certify that I am not an attorney

18   for any of the parties hereto, nor in any way concerned

19   with the cause.

20            Dated this 30th day of April, 2005,

21   in Honolulu, Hawaii.

22

23            BARBARA ACOBA, CSR NO. 412

24            Notary Public, State of Hawaii

25            My Commission Exp: 10-22-2008
```