1

1                IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF HAWAII

3

4   SPORTS SHINKO CO., LTD.,          )  CV 04-00124 ACK-BMK
    etc.,                             )  (Consolidated case)
                                      )
5              Plaintiff,             )  Honolulu, Hawaii
                                      )  March 20, 2006
6         vs.                         )  1:30 p.m.
                                      )
7   QK HOTEL, LLC, a Hawaii           )  KG Defendants' Motion for
    limited liability company,        )  Summary Judgment in
8                                     )  CV 04-00128 ACK-BMK and
              Defendant.              )  Defendant Franklin K.
9   _____  )  Mukai's Joinder in KG
                                      )  Defendants' Motion for
10                                    )  Summary Judgment in
                                      )  CV 04-00128 ACK-BMK and
11                                    )  Motion to Strike Joinder by
                                      )  Defendant Mukai in KG
12                                    )  Defendants' Motion for
                                      )  Summary Judgment in
13                                    )  CV 04-00128 filed on
                                      )  February 17, 2006
14                                    )
                                      )
15  SPORTS SHINKO (USA) CO.,          )  CV 04-00125 ACK-BMK
    LTD., a Delaware                  )
16  corporation,                      )
                                      )
17             Plaintiff,             )
                                      )
18        vs.                         )
                                      )
19  PUKALANI GOLF CLUB, LLC, a        )
    Hawaii limited liability          )
20  company and KG MAUI               )
    DEVELOPMENT, LLC, a Hawaii        )
21  limited liability company,        )
                                      )
22            Defendant.              )
    _____  )
23                                    )
    SPORTS SHINKO (USA) CO.,          )  CV 04-00126 ACK-BMK
24  LTD., a Delaware                  )
    corporation,                      )
25

EXHIBIT C

2

```
 1
                                      )
 2            Plaintiff,              )
                                      )
 3        vs.                         )
                                      )
 4    KIAHUNA GOLF CLUB, LLC, ET      )
      AL.,                            )
 5                                    )
              Defendant.              )
 6    _____)
                                      )
 7    SPORTS SHINKO CO., LTD., a      )  CV 04-00127 ACK-BMK
      Japanese corporation in         )
 8    reorganization, through         )
      KEIJIRO KIMURA, its Deputy      )
 9    Trustee,                        )
                                      )
10            Plaintiff,              )
                                      )
11        vs.                         )
                                      )
12    OR HOTEL, LLC, a Hawaii         )
      limited liability company,      )
13                                    )
              Defendant.              )
14    _____)
                                      )
15    SPORTS SHINKO (USA) CO.,        )  CV 04-00128 ACK-BMK
      LTD., a Delaware                )
16    corporation,                    )
                                      )
17            Plaintiff,              )
                                      )
18        vs.                         )
                                      )
19    MILILANI GOLF CLUB, LLC, a      )
      Hawaii limited liability        )
20    company,                        )
                                      )
21            Defendant.              )
      _____)
22

23                  TRANSCRIPT OF PROCEEDINGS
24          BEFORE THE HONORABLE ALAN C. KAY
                 UNITED STATES DISTRICT JUDGE
25
```

3

```
 1   APPEARANCES:

 2   For the Plaintiffs        PAUL ALSTON, ESQ.
     and Counter Claimants:    GLENN T. MELCHINGER, ESQ.
 3                             Alston Hunt Floyd & Ing
                               American Savings Bank Tower
 4                             1001 Bishop Street, Suite 1800
                               Honolulu, Hawaii  96813
 5
     For the Defendant:        ROBERT A. MARKS, ESQ.
 6                             WARREN PRICE, III, ESQ.
                               Price Okamoto Himeno & Lum
 7                             Ocean View Center
                               707 Richards Street, Suite 728
 8                             Honolulu, Hawaii  96813

 9   For the Defendant and     WILLIAM A. BORDNER, ESQ.
     Third-Party Plaintiff:    JOHN REYES-BURKE, ESQ.
10                             Burke McPheeters Bordner & Estes
                               Pacific Guardian Center, Mauka Tower
11                             737 Bishop Street, Suite 3100
                               Honolulu, Hawaii  96813
12
     Official Court Reporter:  Sharon Ross, CSR, RPR, CRR
13                             United States District Court
                               300 Ala Moana Blvd., Room C-283
14                             Honolulu, Hawaii  96850
                               (808) 535-9200
15

16

17

18

19

20

21

22

23

24

25   Proceedings recorded by machine shorthand, transcript produced
     with computer-aided transcription (CAT).
```

<pre>
 1   MONDAY, MARCH 20, 2006                      1:30 P.M.

 2           COURTROOM MANAGER:  Calling Civil No. 04-00124

 3   ACK-BMK, Civil No. 04-00125 ACK-BMK, Civil No. 04-00126

 4   ACK-BMK, Civil No. 04-00127 ACK-BMK and Civil No. 04-00128

 5   ACK-BMK.  This is Sports Shinko Company versus various

 6   defendants.  This hearing has been called for KG defendants'

 7   motion for summary judgment, defendant Franklin K. Mukai's

 8   joinder, motion to strike joinder by defendant Mukai and also

 9   the motion to strike.

10           Counsel, your appearances for the record, please.

11           MR. ALSTON:  Good afternoon, Your Honor.  Paul Alston

12   and Glenn Melchinger appearing for the plaintiffs.

13           THE COURT:  Good afternoon.

14           MR. MARKS:  Good afternoon, Judge Kay.  Robert Marks

15   and Warren Price for the KG parties.

16           THE COURT:  Good afternoon.

17           MR. BORDNER:  William Bordner and John Reyes-Burke for

18   defendant Mukai.

19           THE COURT:  Good afternoon.  Please be seated.

20   Counsel have been working on this case for several years, and

21   I've only been exposed to it for several days.  So, if you'd

22   bear with me, I have a few questions I'd like to ask of

23   Mr. Alston first.  I feel that I've just gotten through,

24   perhaps, the first chapter of this, which appears to be a very

25   lengthy book.
</pre>

1          MR. ALSTON:  Indeed, Your Honor.

2          THE COURT:  I notice that in some of these cases

3     Sports Shinko (USA) is the plaintiff and in some Sports Shinko

4     Japan is the plaintiff.  Why is that?

01:34PM 5          MR. ALSTON:  It depended on where the debt resided,

6     Your Honor.  In some instances, Sports Shinko (USA) was a

7     direct creditor.  In other instances, Sports Shinko Japan was a

8     creditor.

9          THE COURT:  I thought it -- I thought the debt came

01:34PM 10    down through Sports Shinko Japan who was the borrower from the

11    Japanese banks and it came down from one level to another.

12         MR. ALSTON:  Often, that happened, Your Honor; but

13    sometimes money was lent by Sports Shinko Japan directly to the

14    American entities.  And so, in some instances we had a claim

01:34PM 15    that could be brought by Sports Shinko Japan.

16         THE COURT:  Okay.  And who owns the balance of SS --

17    or Sports Shinko (USA)?

18         MR. ALSTON:  Now, it is all owned by SS-J.

19    Everything -- everything has now been consolidated in -- as a

01:35PM 20    result of the bankruptcy, as I understand it, everything has

21    now been consolidated.  The outside shareholders are all --

22    have all been eliminated; and it's a monolithic hierarchy.

23         THE COURT:  But at the time that these alleged

24    fraudulent transactions took place, who owned the balance of

01:35PM 25    SS-USA?

1        MR. ALSTON:  At that time, as I understand it, there

2    were other companies that were controlled by Mr. Kinoshita.  I

3    don't have the specific names in my mind at this point, but I

4    can provide that to you if you would need it.

01:35PM  5        THE COURT:  Are they companies owned by Toshio?

6        MR. ALSTON:  Yes, Your Honor, or the Kinoshita family.

7        THE COURT:  And I never did see any reference to the

8    dollar amount of the loans to the subsidiaries.

9        MR. ALSTON:  In the aggregate, Your Honor, it was over

01:36PM 10   100 million.  I can't specifically break it down for you as I

11   stand here now; but I -- we can supply that for you, again, if

12   you're interested.  It was substantially in excess of the price

13   paid by KG and its -- or KG's affiliates.  And it was

14   substantially in excess of the value even as we've described it

01:36PM 15   in our papers.

16       THE COURT:  Now, would it be fair to characterize your

17   client's position as Toshio seeing that SS-Japan and the SS

18   empire on its way to bankruptcy transferred these properties in

19   Hawaii to the KG defendants that are priced substantially below

01:37PM 20   the fair market value but, before doing so, encumbered them

21   with management agreements with a termination fee of $3-1/2

22   million?

23       MR. ALSTON:  That's correct, Your Honor.

24       THE COURT:  So, would it be fair to say that the

01:37PM 25   benefit -- the contemplated benefit to Toshio would be a $3-1/2

1    million cancellation fee?

2            MR. ALSTON:  It would be a series of cancellation fees

3    that, in the aggregate, totaled $3-1/2 million.

4            THE COURT:  Right.

01:37PM 5        MR. ALSTON:  That's right.  And as to one of them, the

6    one that was paid, if you will, by the transfer to RMS related

7    to the Maui golf course properties, that was the subject of

8    the -- the fraudulent transfer claim in State Court which was

9    compromised or settled by the return of the property that was

01:38PM 10   paid in lieu of the fee.

11           THE COURT:  So, what would motivate Toshio to sell or

12   transfer the properties to the KG defendants for less than

13   $3-1/2 million under the fair market value?

14           MR. ALSTON:  I believe that the answer would lie in

01:38PM 15   the ability to close the transaction before the bankruptcy

16   actually occurred.  It didn't matter what the property was

17   being sold for.  The question was whether a deal could be

18   consummated before the -- before the bankruptcy occurred.

19           I -- whether there was something more in the way of an

01:39PM 20   unstated, undisclosed back-end benefit to Mr. Kinoshita and his

21   children or others in his family, we do not know.  Certainly

22   one has to ask, and during the depositions we will ask whether

23   there was any benefit that was going to come after closing

24   without disclosure to either the trustee or the creditors.

01:39PM 25           THE COURT:  I thought he had already been deposed.

1          MR. ALSTON:  Mr. Kinoshita has been, but I'm talking

2    about disclosure -- depositions of the KG parties.

3          And we are still waiting, as we had explained in our

4    56(f) request, for disclosure of information on Satoshi

01:40PM 5    Kinoshita's computer which mysteriously crashed shortly after

6    the con -- the transactions were consummated.  And we've been

7    trying to get e-mail and other material that was off -- on his

8    hard drive, which is where we suspect that we might find that

9    sort of information.

01:40PM 10         But as I stand here now, I have no -- no evidence that

11   I could point to that there was, in fact, some further or

12   additional illicit benefit; but I think the principal benefit

13   is that if they closed quickly, then assets could be

14   transferred in satisfaction of the -- of these manage -- the

01:40PM 15   termination of the management contracts, as happened with the

16   Maui property.

17         THE COURT:  I could see that if he sold the properties

18   for, say, less than a million dollars or so, that would

19   expedite the sale; but according to the chart in your

01:41PM 20   opposition --

21         MR. ALSTON:  Yes, sir.

22         THE COURT:  -- the difference between the offers that

23   had been made by other parties and the amount that was received

24   by the SS companies was 30 -- over $30 million.

01:41PM 25         MR. ALSTON:  That's right.  And so, I -- as I said,

1    I --

2              THE COURT:  You don't need to reduce the price $30

3    million to expedite a sale.

4              MR. ALSTON:  Well, the question is how many -- if

01:41PM  5    you're going to turn away every other prospective buyer, as

6    they did, and if you're going to consummate a sale of every

7    company within less than two weeks with virtually no due

8    diligence, then you'll take what you can get, I suggest, rather

9    than -- you know, there was no time to find someone else.

01:41PM 10              And you can see that in the way, for example, the

11    Kauai property was handled where early in January Satoshi

12    Kinoshita signs a DROA to sell the Kauai property for $10

13    million.  Three days later, they sign another contract to sell

14    everything to the KG entities.  And instead of selling the

01:42PM 15    Kauai property for ten, they sell it for approximately three.

16    And the only explanation for that is that they're going to

17    consummate the sale before the bankruptcy can occur and before

18    the Japan trustee can come in and take control.

19              And it -- it's a fire sale, I mean; and whether the

01:42PM 20    $3-1/2 million in management termination fees is the only

21    consideration or, as I said, whether there was something else

22    that is out there yet to be discovered, we don't know.  But

23    I -- you know, it certainly raises a question when the spread

24    between market value and the sales price is so big.  It can

01:43PM 25    only be because, you know, they feel some extraordinary benefit

1    from selling immediately in an extraordinarily hasty manner.

2         THE COURT:  I mean, by such a big difference, $30

3    million --

4         MR. ALSTON:  Right.

01:43PM  5         THE COURT:  -- it would only attract attention to any

6    fraudulent intent that may have been involved.

7         MR. ALSTON:  Indeed.

8         THE COURT:  So, it would work against his interests.

9         MR. ALSTON:  It would -- indeed.  I mean, I suppose in

01:43PM 10    that respect, that's right.  I mean, the spread was so big that

11    it would have to draw some attention; but whether they counted

12    upon the Japan trustee paying little attention to what was

13    happening in Hawaii or whether they thought that in the context

14    of the overall collapse of the Sports Shinko enterprise, where

01:43PM 15    there was literally hundreds of millions of dollars of debt in

16    Japan, that this -- this piece in Hawaii was relatively small

17    or whether they thought that a Japanese bankruptcy trustee

18    would simply -- would not look behind any of the transactions

19    and try to -- and try to, through discovery and through an

01:44PM 20    investigation by a CPA, uncover the difference between market

21    value and sales value, I don't know.

22         It's hard -- it's hard to know what motivated them,

23    but we do know from the documents we've supplied that were

24    generated by Mr. Mukai that there was concern about being

01:44PM 25    caught in a fraud.

```
      1              THE COURT:  Now, was the Goldman Sachs affiliate aware
      2       of this alleged fraud before it purchased the properties -- or
      3       before it purchased the SS companies?
      4              MR. ALSTON:  Right.  The litigation was ongoing for a
01:45PM 5     substantial period of time before the sale of the companies
      6       through the Japan bankruptcy.
      7              THE COURT:  And the Goldman Sachs affiliate purchased
      8       the stock from the trustee in bankruptcy or the receiver or --
      9              MR. ALSTON:  Actually, as I understand it, it's a
01:45PM 10    little bit different than one might expect in a U.S.
      11      bankruptcy.  Apparently the original stock is canceled and new
      12      stock is issued out of the bankruptcy.  So, it's not a matter
      13      of the same shares passing from one hand to another and ending
      14      up in the hands of Southwind, which is the name of the Goldman
01:45PM 15    Sachs entity.
      16             THE COURT:  Like being born again.
      17             MR. ALSTON:  Somewhat, yes, uh-huh.  I mean, it's not
      18      the same shares that have passed through.
      19             THE COURT:  So, before the bankruptcy was closed,
01:46PM 20    everyone, including the external creditors, were aware of the
      21      ongoing litigation in the state court?
      22             MR. ALSTON:  I believe so, Your Honor.  I believe
      23      certainly the trustee, the assistant trustee and other people
      24      involved with the administration of the bankruptcy were aware
01:46PM 25    because we provided reports to them.  I can't say specifically
```

 1    chapter and verse what was told; but I believe that they all

 2    were aware, yes, sir.

 3            THE COURT:  But as I understand it, you're not seeking

 4    standing as a creditor through the external creditors or the

01:46PM  5    trustee in bankruptcy.  You're seeking standing only through

 6    the internal corporate loans; is that right?

 7            MR. ALSTON:  Well, based on the internal corporate

 8    loan, that's right; but what we're saying is that Southwind has

 9    succeeded to the interests controlled by the bankruptcy

01:47PM 10    trustee.  And so, in that -- in that respect, he is not the

11    normal successor in interest to that -- that might be bound by

12    equitable defenses.

13            Rather, in the language of the O'Melveny case, which

14    is 61 F.3d, as Judge Kozinski put it, we are -- we are standing

01:47PM 15    here representing an innocent successor by operation of law

16    since they have succeeded to the interests of the trustee.

17            THE COURT:  So, would it be fair to say that Goldman

18    Sachs' affiliate -- and their name is what?

19            MR. ALSTON:  Southwind.

01:47PM 20            THE COURT:  Southwind?

21            MR. ALSTON:  It's a long -- it's a long name, but the

22    first --

23            THE COURT:  Okay.

24            MR. ALSTON:  -- the first part of it is Southwind.

01:48PM 25            THE COURT:  So that when they purchased the SS

 1    companies, they took into consideration that there may be some

 2    further recovery in the Hawaii State Court litigation?

 3              MR. ALSTON:  So I would believe, Your Honor.  That's

 4    right.

01:48PM  5              THE COURT:  And in this -- the State Court litigation

 6    is now settled?

 7              MR. ALSTON:  The one case in State Court has been

 8    settled.  We're only -- at least all the monetary terms have

 9    been resolved and we've recovered and sold the Maui property.

01:48PM 10    The one thing that remains there is that, as part of the

11    settlement, Satoshi Kinoshita was required to recover the data

12    on his computer that crashed and turn that over to us.  And

13    that's the one small piece that remains unconcluded.

14              THE COURT:  There seemed to be some allusion to -- in

01:48PM 15    one of the papers that instead of taking the $3-1/2 million

16    cancellation fee, he took a Maui Pukalani residence.

17              MR. ALSTON:  No, Your Honor.  There was -- as I

18    mentioned before, there was a series of cancellation fees that

19    aggregated $3-1/2 million.  The cancellation fee on the Maui

01:49PM 20    prop -- the Pukalani property was paid in kind, if you will, by

21    giving him a residence which we subsequently sold for the

22    benefit of Southwind at a price of approximately $575,000.  And

23    so, the property was worth approximately the cash value of the

24    cancellation fee.

01:49PM 25              THE COURT:  Thank you.  I'll now let Mr. Marks proceed

1   with his motion.

2          MR. MARKS:  Thank you, Your Honor.  Your Honor, I have

3   only two very brief points to make.  The first is that the law

4   does not permit a company to defraud itself and then make

01:50PM  5   itself whole from a third party.

6          Your Honor, if I may, I have a demonstrative aid that

7   might assist the Court.  I've given it to Mr. Alston.

8          THE COURT:  Very well.  Do you have a copy for my

9   clerk, too?  Thank you.

01:50PM  10         MR. MARKS:  Never forget the clerk.  Your Honor,

11  I've -- the facts stated on that document entitled "road map"

12  outline the key undisputed facts that are necessary in order to

13  grant this motion.

14         What the plaintiff has pled in the complaint and

01:50PM  15  conceded in discovery and further animated in the discussion

16  just now is that Toshio controlled all of the Sports Shinko

17  companies, including the creditor and the debtor; that he owned

18  all the Sports Shinko companies, including the creditor and

19  debtor; that Toshio told the Japan banks that he would sell the

01:51PM  20  Hawaii assets of Sports Shinko to pay the Japan bank creditor

21  of Sports Shinko Japan; that Toshio masterminded this grand

22  conspiracy that was supposed to net $3-1/2 million.  But

23  somehow I suppose the allegation is necessarily that Toshio

24  wasn't such a great conspirator because he only netted a house

01:51PM  25  that's apparently worth $400,000.  But apparently this

1    elaborate conspiracy was designed to defraud the Japan banks;

2    and in addition to all that, there's no dispute --

3         THE COURT:  Well, while you're speaking about

4    conspiracy, when the KG defendant purchased the properties, did

01:51PM 5    they think that the prices were unreasonably below the fair

6    market value?

7         MR. MARKS:  What KG believed is that they were buying

8    all the parcels, two hotels and three golf courses from a

9    company that they knew were having -- was having problems.  And

01:52PM 10   they bought it in the immediate aftermath of September 11th

11   when the industry was very unstable and there were problems,

12   serious problems.  They had been involved in prior

13   transactions --

14        THE COURT:  What industry are you referring to?

01:52PM 15        MR. MARKS:  The visitor industry, the golf industry.

16   People weren't coming to Hawaii at that point.  It was a very

17   unstable market.

18        KG had also previously been involved in a transaction

19   with Shinowa on Maui where they were to buy assets there.  And

01:52PM 20   it was a very long process and in the end there was a very

21   accelerated closing process and none of this seemed unusual to

22   KG.

23        They made an offer in December.  The purchase and sell

24   agreement was executed some weeks later, and it closed fairly

01:53PM 25   quickly thereafter.

1          So, there is very much a question of fact about
2     whether the price paid was a fair price, especially considering
3     the sewage treatment plant; but we're willing to look past all
4     of that for the purposes of this motion, Your Honor, and
01:53PM  5     concede the facts as stated in the complaint are true.

6          THE COURT:  Concede what fact?

7          MR. MARKS:  That the price was too little.  I mean,
8     we'll concede that for purposes of this motion.  This motion
9     began as a Rule 12 motion, and we -- as more evidence was
01:53PM 10     developed to support it, it became a Rule 56 motion.  And then
11     it was filed under Rule 56 because of the attachments.

12          THE COURT:  I didn't hear you.

13          MR. MARKS:  The motion was filed pursuant to Rule 56
14     because we had exhibits attached; but in our mind's eye as we
01:53PM 15     started this, it was a Rule 12(b)(6) motion.

16          THE COURT:  What about the management agreements?  Did
17     that cause you any thought, or your clients?

18          MR. MARKS:  I don't believe it caused any thought at
19     all.  Apparently KG was given an opportunity to agree to an
01:54PM 20     assignment of the management agreements, and it didn't.  It
21     didn't accept the management agreements.

22          THE COURT:  I mean, these management agreements were
23     just executed shortly before the sale, weren't they?

24          MR. MARKS:  I don't know the dates of it.  Probably, I
01:54PM 25     believe so.  But the -- you know, the point is that the

1    management agreements were presented to KG; and if I understand

2    correctly, they declined to accept them.  So --

3        THE COURT:  And that caused the $3-1/2 million fee to

4    the management company.

01:54PM  5        MR. MARKS:  And KG acting in its own best interests

6    believed that it could pursue management in a more

7    cost-effective way without taking the assignment of those

8    agreements.

9        You know, there's nothing in that that I can see that

01:54PM 10    suggests any impropriety by KG at all.  There were incumbent

11    managers at the golf courses and hotels.  KG had the option to

12    accept or reject them, and they rejected them.

13        But most importantly, Your Honor, the sale of the KG

14    assets -- I'm sorry -- of the Sports Shinko (Hawaii) assets to

01:55PM 15    KG were specifically approved by Toshio.  These are the only

16    material facts that are necessary to be -- to find in favor of

17    KG on this motion.

18        Sports Shinko's whole case presumes Toshio's complete

19    control of the Sports Shinko empire because without that

01:55PM 20    complete control, Sports Shinko Japan could not reach anywhere

21    into the corporate structure and sell remote subsidiaries'

22    assets to pay the Japan company's debts.  This is, indeed, the

23    very heart of the plaintiff's case that Sports Shinko defrauded

24    itself.

01:55PM 25        This distorts fraudulent transfer law and turns it

1    into a vehicle to commit fraud rather than redress it.  In a

2    fraudulent transfer case, Your Honor, at least two basic

3    showings are necessary before a transferee has exposure.

4         First, there's a creditor who is defrauded by a

01:56PM  5    debtor; and the second is an enforceable debt between them.  In

6    an ordinary fraudulent transfer case, that would be an issue to

7    be contested between the parties who know about the debt, the

8    creditor and the debtor.  And the transferee is insulated

9    unless there are findings that push the case toward a

01:56PM  10   fraudulent transfer case; that is, if the creditor was not

11   defrauded by the debtor or if there was no debt, there's no

12   claim against the transferee.

13        In this case where the fraud victim controls the fraud

14   perpetrator, all of this gets glossed over in a combined effort

01:56PM  15   by the debtor and the creditor to pursue the transferee.  And

16   that's what's happened here.  Fraudulent transfer law is turned

17   on its head, and a whole new species of fraudulent transfer

18   case is invented.

19        If Sports Shinko's theory is correct, we can expect

01:57PM  20   that sellers will sell their properties through a wholly owned

21   controlled subsidiary that is indebted to the parent company.

22   The sale will occur.  The debt will not be repaid, and then the

23   seller's parent waits.  And in a rising market, the seller's

24   parent then sues the buyer and picks the buyer's pocket for

01:57PM  25   additional money.

1         That's what's happened here.  The seller defrauds

2    itself, and the transferee is left on the receiving end of a

3    lawsuit.

4         THE COURT:  Apparently they had offers at that time.

01:57PM  5    We're not talking about a rising market.  They had offers at

6    the time that exceeded $30 million, what your clients paid for

7    the property.

8         MR. MARKS:  There were no offers that were anything

9    like the offer that KG made because what KG offered to do was

01:57PM 10    to take the entire Sports Shinko Hawaii asset pool and acquire

11    them all at once.  There was no other offer anything like that.

12         There was an offer for a golf course, an offer for a

13    hotel; but there was no offer for all the combined assets.  And

14    there are, of course, economies of scale that come with that

01:58PM 15    kind of offer in a very uncertain market after September 11th.

16         THE COURT:  They still had the offers.

17         MR. MARKS:  But the seller didn't accept those offers.

18         THE COURT:  (Inaudible.)

19         MR. MARKS:  They apparently -- and Mr. Alston has

01:58PM 20    information about this, Your Honor.  I mean, we've shown

21    through the privilege log that Toshio was deposed for three

22    days by Mr. Alston.  I imagine that Mr. Alston has

23    Mr. Kinoshita's answer to these questions, but he's treating it

24    as work product.  So, we're left to wonder ourselves.  I

01:58PM 25    imagine that Mr. Kinoshita has an answer for these questions,

1    Your Honor.

2          Your Honor, in this case there are no innocent

3    shareholders.  The entire empire was owned by Toshio and his

4    three sons.  There are no innocent arm's-length creditors in

01:59PM   5    this case, only a creditor who was complicit in the so-called

6    fraud.  There's no trustee; and there's no receiver, as the

7    Court observed.

8          And this would be a very different case if this were a

9    case by an arm's-length creditor or a trustee or a receiver.

01:59PM  10    Instead, all we have here is a so-called creditor alleging that

11    it was defrauded by a company that it absolutely controlled,

12    suing a transferee because it says the transferee paid too

13    little.

14          None of the parties in this litigation have found a

01:59PM  15    single case involving a fraudulent transfer with intercompany

16    debt.  If these novel cases stand, it will be an unwarranted,

17    unprecedented and dangerous extension of fraudulent transfer

18    law.  Uniform Fraudulent Transfer Act is a very broad statute,

19    but there is no way that the Legislature intended this statute

01:59PM  20    to be used as a device to commit fraud against a transferee.

21          My second point, Your Honor, is one that also came up

22    briefly during your colloquy with Mr. Alston.  There's no

23    damaged party here.  Sports Shinko wasn't damaged.  If you look

24    at the handout that I gave you under the portion called

02:00PM  25    so-called debt, that's a quote from Paragraph 12 of the second

1    amended complaint.

2          Sports Shinko Japan borrowed money from a Japanese

3    bank.  It then lent it to subsidiaries and ultimately to Sports

4    Shinko Mililani, the debtor in 4-128.

02:00PM 5          If this bank debt was resolved in bankruptcy, as it

6    should have been because it was a debt of Sports Shinko Japan,

7    the parent company and the debtor to the banks, the fact that

8    the proceeds of the loan were in turn --

9          THE COURT:  What about Sports Shinko (USA)?  I think I

02:01PM 10   heard Mr. Alston say that some of the loans from the Japanese

11   banks were to Sports Shinko (USA).

12          MR. MARKS:  That's correct, Your Honor.  Some --

13          THE COURT:  It didn't go into bankruptcy, did it?

14          MR. MARKS:  USA did not, no; but the -- but the debt

02:01PM 15   in each of those cases was nonetheless the debt of Sports

16   Shinko Japan.  It would -- in this case, for example, Japan

17   lent the money to USA; and USA in this case, in 128, lent the

18   money to Sports Shinko Mililani.  It was still Sports Shinko

19   Japan's debt to a Japanese bank, and that was resolved in

02:01PM 20   bankruptcy.

21          The fact that the parent company chose to cycle the

22   money through to a Hawaii subsidiary doesn't make it any less

23   its debt to its Japanese bank.  And if the Japanese bank was

24   paid in bankruptcy, the company can't be damaged because it

02:01PM 25   made a loan to itself that it didn't repay to itself.  On the

1    balance sheet it would still net out to nothing.

2        Your Honor, as Mr. Alston acknowledged again today,

3    these cases are being pursued by Sports Shinko's new owner,

4    Goldman Sachs, for Goldman Sachs' benefit, not for a Japan

02:02PM  5    bank, not for an arm's-length creditor.  This case is a sham by

6    Goldman --

7        THE COURT:  You know, you use the term "arm's-length

8    creditor" in your opp -- in your motion; but I don't see that

9    term anywhere in the Uniform Fraudulent Transfer Act.

02:02PM  10       MR. MARKS:  In fact, it's not, Your Honor.  But may I

11   offer another demonstrative aid to illustrate the point?

12       THE COURT:  You mean, Whiteacre and Blackacre again?

13       MR. MARKS:  No, this one's different, much more

14   better.  No Whiteacre here, Your Honor.  Instead, we have an

02:03PM  15   arm to illustrate the arm's-length transaction.

16       Looking at the first page of that handout, this is how

17   a fraudulent transfer case ordinarily works.  If you look

18   inside the dotted lines there, before there is any case against

19   a transferee, there needs to be a creditor who was defrauded by

02:03PM  20   a debtor and a debtor who has no defenses.  That's normal.

21   That insulates the transferee from liability.

22       The reason that KG is prejudiced in this case where

23   it's an intercompany debt where the creditor and the debtor are

24   basically one and the same is illustrated on the second page.

02:03PM  25       Here we have a case where a creditor is very motivated

1   to say, and then does say, in effect, that it was defrauded by

2   itself.  And we also have, in the memorandum in opposition, a

3   debtor stepping up to say, oh, we'll admit the debt even though

4   we can't find the promissory notes if they even exist; but

02:03PM   5   that's okay, we'll -- we, the debtor, will admit the debt if

6   that will help advance the case.

7         Well, of course, they'll do that, Your Honor.  Their

8   interests are identical.  And both of these factors prejudiced

9   KG.  This is not a normal case under the UFTA because the

02:04PM  10   two -- the creditor and the debtor are uniformly controlled by

11   the same group, whether previously by Toshio or now by Goldman

12   Sachs.

13         This is why the UFTA is turned on its head by this

14   case because the transferee is not in a position to determine

02:04PM  15   what defenses the debtor might have.

16         We've asked Sports Shinko to produce the notes.  We've

17   asked Sports Shinko to even identify the amounts of the debts

18   sued upon in each case; and to date, they haven't been able to

19   do that.  And meanwhile --

02:04PM  20         THE COURT:  Well, if this action had been brought by

21   the receiver --

22         MR. MARKS:  We wouldn't be filing this motion, Your

23   Honor.  This motion wouldn't work with a receiver.  And

24   that's -- that's the delusion here, Your Honor, is that the

02:04PM  25   cases that Sports Shinko cites to support their case are --

1   exemplify the extraordinary powers of a receiver or a trustee

2   or a shareholder or an arm's-length creditor, but not an inside

3   creditor.

4        THE COURT:  But in this case Southwind has purchased

02:05PM  5   from the receiver.

6        MR. MARKS:  I'm not -- you know, I can't profess, Your

7   Honor, to be an expert in Japanese bankruptcy law.  As I

8   understand it, new shares were issued.  There's apparently a

9   very different procedure in Japanese corporate reorganization.

02:05PM  10       As I understand it, at the outset, from the time of

11   filing, the trustee searches for basically a sponsor; and the

12   sponsor ends up working the case through to the end and

13   acquiring the company in the end, I suppose, if all goes well.

14       I may not have this right, Your Honor.  My ability to

02:05PM  15   read Japanese and understand Japanese corporate law is very,

16   very limited.

17       I don't think it's right to say that they took without

18   notice -- in fact, Mr. Alston concedes that they took with

19   notice of the state claim.  What he doesn't acknowledge is

02:06PM  20   that, in addition, these federal cases were filed before the

21   acquisition by Southwind.  So, Southwind also took with

22   knowledge of whatever jeopardy these cases bring.

23       From my point of view, the reasoning of O'Melveny fits

24   to a T.  They knew about the problems of prior management; and

02:06PM  25   they discounted their purchase price, to the extent any of this

1  was even material, in a huge transaction that was primarily

2  based in Japan.

3          THE COURT:  Well, maybe they paid more for it

4  considering that they might recover something from the federal

02:06PM  5  actions?

6          MR. MARKS:  That would be, I think, unusual behavior

7  but perhaps.

8          THE COURT:  Well, it's certainly not a -- I mean, if

9  anything, it's a potential asset, isn't it?

02:06PM 10          MR. MARKS:  It shows an action, and I think it's

11  amenable to evaluation as having risk.  And, again, Mr. Alston

12  can evaluate this case better than we can because of all the

13  discovery he's done of the Japanese actors that we haven't done

14  and that he won't share with us.

02:07PM 15          THE COURT:  Well, you know, I was reading from a

16  decision by Judge Possner in another case; and he says, "But

17  the reason, of course, as the cases just cited made clear, is

18  that the wrongdoer must not be allowed to profit from his wrong

19  by recovering property that he had parted with in order to

02:07PM 20  thwart his creditors.  That reason falls out now that Douglas

21  has been ousted from control of a beneficial interest in the

22  corporations.  The appointment of the receiver removed the

23  wrongdoer from the scene.  The corporations were no more

24  Douglas' evil zombies.  Free from his spell, they became

02:07PM 25  entitled to the return of the moneys for the benefit not of

1    Douglas but of innocent investors that Douglas had made the

2    corporations divert to unauthorized purposes."

3            Now, that case is not on -- you know, precisely on all

4    fours; but wouldn't Southwind be put in the position of an

02:08PM  5    innocent investor?

6            MR. MARKS:  Quite the contrary, Your Honor.  It took

7    with notice of the problems associated with prior management.

8    I don't -- I think it takes -- and steps into the shoes of

9    prior management, quite the contrary, not like a trustee who

02:08PM 10    is, as the O'Melveny court explains, thrust into the shoes of

11    the prior control group.  The owner makes a considered business

12    judgment and evaluates whether to acquire.  And so, they are

13    fairly taking with knowledge and with the taint of the alleged

14    misconduct of the prior owners.

02:08PM 15            THE COURT:  But apparently they presumably paid more

16    for it on account of that potential asset.

17            MR. MARKS:  Your Honor, we haven't done any discovery

18    on this.  We, in fact, tried to submit informal discovery to

19    the actors for Goldman Sachs in Japan who were responsible for

02:09PM 20    the acquisition; and we were basically shut down flat.  We were

21    in an environment where Judge Kurren was encouraging the

22    parties to share information so that we could hopefully resolve

23    the case; but when we went to Japan to Southwind Realty Finance

24    (Cayman Company) and to principals at Goldman who were

02:09PM 25    intimately involved in the transaction, we were told to contact

1   them through The Hague Convention, they would not be responding

2   with any information.

3            I don't believe, Your Honor, just looking at the

4   dynamics of this company, that these overseas assets even got

02:09PM  5   onto the radar screen of Goldman Sachs.  The big assets in play

6   in this acquisition, as I understand it, were in Japan.

7            But assuming they did, I don't think that there is any

8   equitable basis or legal basis to ascribe to the purchaser, who

9   takes with notice, anything other than the knowledge of the

02:09PM  10  predecessor actors for the company.

11           THE COURT:  But it appears that once the receiver gets

12  into the act, then the purchaser takes and stands in the shoes

13  of the receiver.

14           MR. MARKS:  I've never -- that hasn't been briefed.

02:10PM  15  I -- the first time I heard that that was the theory that

16  Mr. Alston was operating from was today during his statements

17  earlier today.

18           As we had understood it, they bought; they owned the

19  stock; they took with notice and they take with whatever warts

02:10PM  20  they acquire by virtue of the acts of prior management.  I

21  think that's the law.  Although, again, I haven't really looked

22  into it.

23           THE COURT:  I mean, Judge Possner goes on to say, "The

24  defense of in pari delicto loses its sting when the person who

02:10PM  25  is in pari delicto is eliminated.  And he's eliminated by the

1    receiver taking over the property.

2             MR. MARKS:  You know, if -- there are any number of

3    doctrines in which to pigeonhole this motion -- KG's motion for

4    summary judgment.  One of them is that there's no standing,

02:11PM 5    that Sports Shinko is suing as though it were the Japan bank or

6    the trustee.

7             THE COURT:  That's the crux of your motion, isn't it?

8             MR. MARKS:  That's right.  But they're not that, as

9    the Court observed in the discussion earlier today with

02:11PM 10    Mr. Alston.  They are now a stand-alone company that has

11    basically acquired new stock, replacing the old stock, of the

12    people that they allege were behaving in a fraudulent fashion.

13             So, what happens in that process that cures that, to

14    the detriment of a transferee, is beyond me.  If you look at

02:11PM 15    fraudulent transfer law from a distance, ordinarily there's

16    nothing wrong with getting a good deal on a purchase.  In a

17    free economy, that's encouraged.

18             The time when getting a good deal becomes actionable

19    is when there's a creditor who's defrauded.  But this creditor

02:12PM 20    was acting with this debtor.  And so, there is no equitable

21    basis.  Comparing the rights of the creditor, who's an insider,

22    to the transferee, the balance shifts when the creditor and the

23    debtor are basically one and the same.  And it just corrupts

24    the entire uniform fraudulent transfer scheme when you penalize

02:12PM 25    a transferee because a creditor and a debtor who are basically

1    the same entity say they've been defrauded.  It just creates

2    havoc and turns the entire act upside down.

3            Is there anything more, Your Honor.

4            THE COURT:  No, I think I've said enough.  Thank you.

02:12PM  5            MR. MARKS:  I hope I have, too.  Thank you, sir.

6            THE COURT:  Mr. Bordner, do you want to say something?

7            MR. BORDNER:  Well, Your Honor, we simply have joined

8    in the motion that's before the Court today.  My intention

9    wasn't to create a big brouhaha about joinder versus --

02:13PM 10            THE COURT:  I have almost as many papers on that as --

11            MR. BORDNER:  I must have struck a nerve somewhere.

12            THE COURT:  -- I do on the motion itself.

13            MR. BORDNER:  It must have struck a nerve somewhere.

14    But my intention was simply to file a joinder and to note to

02:13PM 15    the Court that the in pari delicto argument is just another

16    label to put on what essentially the argument has been through

17    the Kobayashi group.

18            THE COURT:  Thank you.  Mr. Alston?

19            MR. ALSTON:  Thank you, Your Honor.  First, let me

02:13PM 20    clarify some things.  I may have misspoken with respect to the

21    relationship between SS-USA and SS-Japan and the reason why

22    both are plaintiffs here.

23            What I meant to say was that in some instances SS-J

24    was a direct creditor of the -- the entity that sold its

02:13PM 25    assets.  In other instances, SS-USA was a direct creditor, not

1    because the Japanese banks had lent money directly to SS-USA

2    but because the money had flowed from the banks to Japan to

3    USA.

4            So, in every instance at the end of the day Japan was

02:14PM  5    the source of the money; but sometimes USA was itself a lender

6    and sometimes Japan was a lender.

7            THE COURT:  I see.

8            MR. ALSTON:  And sometimes both.

9            The second thing is Mr. Melchinger has corrected my

02:14PM  10   recollection of the Maui termination fee.  In fact, that Maui

11   property was transferred to the person who was nominally in

12   control of RMS, the management company --

13           THE COURT:  Mr. Nishida.

14           MR. ALSTON:  -- Mr. Nishida, who I understand is now

02:14PM  15   working for KG and -- the KG companies; transferred it to

16   Mr. Nishida for a $200,000 credit on the management fee.  We

17   subsequently sold it due to a run-up in prices at 575, I

18   believe it was, or thereabouts; but it was not in full

19   satisfaction of that termination fee.  It was just the property

02:15PM  20   that was on hand at the time to transfer.

21           Mr. Marks said that it must be that Toshio and his

22   sons were poor conspirators because they ended up with only the

23   Maui property in satisfaction of their $3-1/2 million claim.  I

24   don't believe there's any support for saying that.  I think the

02:15PM  25   record is that with respect to the remainder of the $3-1/2

1    million, there were claims for that that remained unpaid

2    because the bankruptcy overwhelmed them, not because they took

3    that in satisfaction of the debt.

4         Mr. Marks would have you look at this case as though I

02:15PM 5    represented Toshio and his sons and we were here in a closed

6    universe where no one outside the Kinoshita family was either

7    benefited or harmed by this array of below-market transfers.

8    That is simply not the case.  We are here standing in the shoes

9    of the former bankruptcy trustee; and as you have indicated,

02:16PM 10   where a trustee or a receiver or someone else has stepped in,

11   the sting of the in pari delicto doctrine and other equitable

12   defenses, such as imputation, disappear.

13        We are entitled to, I suggest, pursue these claims

14   free of whatever equitable arguments might have been advanced

02:16PM 15   if the Kinoshitas had the change of heart that Mr. Marks is so

16   worried about and had come in to unwind their own transactions.

17        The other fundamental flaw in Mr. Marks' approach to

18   this is that he assumes that a fraudulent transfer claim can

19   only be made by a creditor who was actually defrauded by the

02:17PM 20   transfer in question.  In fact, under Section 4(a)(1) of the

21   Uniform Fraudulent Transfer Act in Hawaii, a fraudulent

22   transfer claim can be brought if the transfer was made with

23   the -- excuse me, let me back up -- a fraudulent transfer claim

24   can be brought by a future creditor, one who did not exist when

02:17PM 25   the transfers occurred, if the transfer was made with the

1    actual intent to hinder, delay or defraud any creditor.

2           So, the creditor who's bringing the claim doesn't have

3    to be one who was defrauded at the time.  It can be a creditor

4    who finds itself in that position weeks, months or even years

02:18PM  5    after the transfer was made.

6           And I suggest to you that, to use the born again

7    analogy, what the company -- the creditor companies are now is,

8    in effect, future creditors who are entitled to complain

9    because there was a fraud on -- on creditors.  And for that

02:18PM 10    proposition, I would ask you to look at the Hawaii Supreme

11    Court's decision in the UFJ case where what they explained was

12    that under Japan law, a Japan creditor of a parent company

13    enjoys the right to drill down through layers of subsidiaries

14    and assert direct claims against lower-tiered subsidiaries

02:18PM 15    based on claims that arise in Japan.

16           And so, to the extent that we now have a new owner who

17    was a successor to the receiver who was protecting the

18    interests of the Japan creditors, we've got a -- somebody who's

19    been defrauded in the -- in the sense of 601(c)(4)(A), a future

02:19PM 20    creditor, all right?

21           The issues of who can sue here are not judged by

22    whether there was an arm's-length debt or not.  As you pointed

23    out in discussing -- in your colloquy with Mr. Marks, the

24    Uniform Trans -- Fraudulent Transfer Act does not use the

02:19PM 25    phrase "arm's-length creditor."  In fact, the term "creditor"

1    is defined as broadly as can possibly be imagined.

2          What Mr. Marks is talking about here is really

3    asserting equitable defenses to the claim.  And for all the

4    reasons that we've argued, all the reasons that Judge Possner

02:20PM  5    explained and all the reasons that the Ninth Circuit has made

6    clear in the O'Melveny case where you have someone who steps in

7    as an innocent, they are entitled to pursue the claims.

8          And even though the names of the plaintiff companies

9    may be the same, we are, in fact, talking about new entities

02:20PM 10    under new ownership that are innocent of the kinds of

11    wrongdoing that Mr. Marks wants to attribute to -- and fairly

12    to Toshio Kinoshita and his sons.

13          Do you have any questions, Your Honor?

14          THE COURT:  No, I don't have any questions.  Thank

02:20PM 15    you.

16          MR. ALSTON:  Thank you.

17          THE COURT:  Mr. Marks?

18          MR. MARKS:  Thank you, Your Honor, just a couple of

19    points.  Judge Possner, in the passage that you read from,

02:21PM 20    presumes that there were innocent people who were defrauded.

21    In this case the only fraud was to the companies that Toshio

22    controlled and owned.  The fraud left no innocent people in its

23    wake.

24          And it is unseemly and novel for this successor to the

02:21PM 25    trustee to be born again.  The ordinary rule in American

1    jurisprudence is the successor management takes with the

2    knowledge of prior owners and prior managers.  And in this

3    instance, in fact, this lawsuit and the State Court litigation

4    were pending at the time that Southwind or whichever Goldman --

02:21PM  5    I think there's actually some -- a high degree of confusion

6    about what Goldman company took.  I believe Southwind took

7    initially, and it's been transferred multiple times since then.

8         But the point here is there's no innocent party to

9    redress.  If this were, as Mr. Alston argues, the Japan bank

02:22PM  10   suing as it can pursuant to the UFJ case, suing in Hawaii to

11   recover from a subsidiary, that would be a different case.  If

12   this were the trustee, as it was at one point, suing, that

13   would be a different case.

14        But now, the only plaintiffs left are the plaintiffs

02:22PM  15   who were involved in the fraud that they're now suing on.  And

16   it just makes no sense, Your Honor.

17        Mr. Alston has speculated about how it is that the

18   $3-1/2 million became a $400,000 house and what the

19   machinations were.  This has been the source of ongoing

02:22PM  20   frustration for us, Your Honor, because Mr. Alston's had the

21   benefit of many days of depositions with the principals of the

22   old Sports Shinko regime, including Toshio, Satoshi, Tsugio

23   Fukuda, all of the individuals listed on that privilege log.

24        We've seen one deposition of Satoshi that they

02:23PM  25   released.  Other than that, we're left to wonder.  What was

1    Toshio thinking?  We have no idea.  Mr. Alston knows, and I

2    would hope in the interest of candor we would at some point be

3    able to find that out.

4              THE COURT:  You're asking for a 56(f) delay --

02:23PM  5              MR. MARKS:  No, I'm not, Your Honor.

6              THE COURT:  -- in your own motion?

7              MR. MARKS:  I'm certainly not.  I don't think that's

8    necessary, but I think -- I do think it just -- you know, it

9    calls into question some of the many issues that lie ahead in

02:23PM 10   the case, if nothing else, Your Honor.

11             I'm particularly baffled by the argument that

12   Mr. Alston made in his reply to Mr. Bordner's motion and again

13   today about future creditors.  Until that reply memo was filed,

14   from the time this proceeding was begun over two years ago, it

02:23PM 15   was our understanding that there were intercompany notes that

16   were written years ago which is the basis for the claim.

17             Is there now a new creditor claim?  Does Southwind

18   have a note?  If so, why isn't Southwind suing?  Why is Sports

19   Shinko suing?  I mean, this whole idea about a future creditor

02:24PM 20   doesn't fit the facts as we understand them; and it certainly

21   doesn't fit the pleadings.  So, I'm not sure where all that

22   begins and ends other than sort of a -- you know, a last ditch

23   attempt --

24             THE COURT:  Well, if Sports Shinko (USA) had loans out

02:24PM 25   to subsidiaries that were a debt to Sports Shinko (USA) and

1    Southwind purchased stock in USA or -- and its parent --

2              MR. MARKS:  But that's not a new creditor, Your Honor.

3    That's a new owner of an existing owner.

4              THE COURT:  They would take over -- they would take

02:24PM  5    over that indebtedness, wouldn't they?

6              MR. MARKS:  Yeah, but that's not a new debt.  That

7    section applies to a new debt, not to -- not to a new owner of

8    an old debt.  The same rules apply, Your Honor.

9              And, again, you know, looking back, Sports Shinko

02:24PM 10   Japan was owned by Toshio and his three sons.  There was also a

11   corporate shareholder that was owned, in turn, by Sports Shinko

12   Japan.

13             THE COURT:  So, it's your position that a new owner

14   cannot be a new creditor?

02:25PM 15             MR. MARKS:  Unless there's some novation -- is there a

16   new debt?  Is there -- you know, I mean, if they've

17   manufactured new debt, I suppose we could talk about --

18             THE COURT:  Is that what the act says, a new owner

19   can't be a new creditor --

02:25PM 20             MR. MARKS:  I think the --

21             THE COURT:  -- because they -- because they take over

22   the position of the ownership --

23             MR. MARKS:  I don't think the --

24             THE COURT:  -- where there is debt?

02:25PM 25             MR. MARKS:  I don't have the statute in front of me,

1    Your Honor; but I don't believe that that's how that provision

2    works at all.  I believe it applies to debt that's created

3    subsequently.  I -- I don't know.

4         (Off-the-record discussion.)

02:26PM  5         MR. MARKS:  You know, we've looked long and hard at

6    this statute; and we're quite surprised to this see this new

7    analysis.  I don't think it applies to a new owner of an

8    existing creditor.  I think the -- if the debt existed

9    previously, the debt is what it is.

02:26PM 10         And, again, if you look, for example, at real estate

11    transactions, which I think is the most common analogy that I

12    can offer to the Court for this purpose, when there is a cloud

13    on title that's recorded, the buyer takes subject to the cloud.

14         Likewise, here, the buyer took with knowledge of the

02:26PM 15    alleged bad acts of Toshio.  That was the predecessor

16    management.  And at the time of this transaction, none of the

17    parties to this litigation were hurt.  If there were a trustee

18    who were coming in to sue on behalf of general creditors, I

19    would understand that.  If it were a Japan bank suing, I would

02:26PM 20    understand that.  And this would -- this motion wouldn't be

21    before the Court.

22         THE COURT:  Well, I don't know what -- what all was

23    involved in the Japanese bankruptcy, what other assets these

24    companies had that went to creditors.

02:27PM 25         MR. MARKS:  I believe none, Your Honor.  I -- my

1    understanding is that the -- it may be --

2          THE COURT:  But, I mean, if there were other assets

3    that went to the creditors, then the Sports Shinko companies

4    were hurt by not having the assets -- or not having had these

02:27PM  5    Hawaii properties bring the full fair value.

6          MR. MARKS:  And if the creditors who were hurt were

7    suing, this motion wouldn't be before the Court.  The

8    problem -- the fatal flaw with this motion is that a creditor

9    who was complicit in the alleged fraud is suing the transferee.

02:27PM 10    It -- it takes the law -- the well-established law of

11    fraudulent transfer and turns it upside down.

12          We've cited to the -- the very first case reported in

13    Hawaii reports.

14          THE COURT:  Back in the 1800s?

02:28PM 15    MR. MARKS:  1848, I believe it was, Your Honor, the

16    very first case that talk -- it was a fraudulent transfer case

17    and it speaks about the just claims of honest creditors.

18    That's the difference between this case and a normal fraudulent

19    transfer case.  And we believe the motion should be granted for

02:28PM 20    that reason.

21          Thank you, Your Honor.

22          THE COURT:  Thank you.  Well, I'm ready to rule.  I am

23    going to deny the motion for summary judgment because I find,

24    No. 1, the Hawaii Uniform Fraudulent Transfer Act does not

02:28PM 25    exclude from its definition of creditors those creditors that

1    are corporate parents of the debtor and, No. 2, that there are

2    genuine issues of material fact that underline a determination

3    of whether Toshio's knowledge and intent can be imputed to the

4    plaintiff.

02:28PM  5         I will deny plaintiff's request for a Rule 56(f)

6    continuance as unnecessary since this Court is denying the

7    motion for summary judgment.

8         And I will grant the plaintiff's motion to strike the

9    untimely joinder of Mr. Mukai, as I find that the joinder is a

02:29PM 10   substantive joinder.  And I'm only striking it to the extent

11   that I find that it is a substantive joinder, not otherwise,

12   and it was filed well past the deadline set by the local rules.

13        But I will file a written order, and I'm sure we'll

14   meet again on numerous occasions.

15        (Proceedings concluded at 2:29 p.m.)

16

17

18

19

20

21

22

23

24

25

```
 1                    COURT REPORTER'S CERTIFICATE

 2              I, Sharon Ross, Official Court Reporter, United

 3    States District Court, District of Hawaii, do herby certify

 4    that the foregoing is a correct transcript from the record of

 5    proceedings in the above-entitled matter.

 6              DATED at Honolulu, Hawaii, March 24, 2005.

 7

 8                              /s/Sharon Ross

 9                              SHARON ROSS

10                              CSR 432, RPR, CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```